I'm advised that in the circuits around the United States, only 10% of the civil cases are reversed. Assuming that's correct, I recognize the burden I have as representing the appellants in this case. However, on the other hand... I think that's a little low for civil. Okay. And so... That's the best information I have generally, but I... And so that's... At least the point I'm making is that it shows that I have a burden. But on the other hand, where the court grants summary judgment, as they did in this case, we think the odds go up just a little bit. And so I want to talk about, broadly, the issues that we have in this case. We have a 10-plus volume appendix, so I can't go cite everything. I'm limited in time. So let me broadly talk about the issues that we have here. And so the central to all of the rulings... You don't have to cover them all. You can leave some for your brief if you want to prioritize. Thank you. That's up to you. Thank you, Your Honor. And I'm going to do that, Your Honor. And so central to all of the rulings of the court... And we have highest respect for the district judge, but we think she erred in finding that the alarm sounded and the issue of whether or not it timely sounded in the circumstances of this case. Let me point to four things, and I'm not trying to be exclusive in my recitation of the evidence that creates five questions, but these are four that come to mind. One, the affidavit of Jennifer Gray. She was there in the apartment next door. She testified in her affidavit. She could have heard the fire alarm, would have heard the fire alarm, did not hear the fire alarm. When did she take the sleeping pill that night? Well, I don't know. The record shows... I thought that was in one of the briefs. Well, I... She said she had trouble sleeping that night and took a pill. But she woke up, and the time that she woke up was 530. She called the 911. Well, I know, but when... Was she sleeping when the alarm went off? Well, I don't... What's the time relation? We suggest that her affidavit would establish that she would have heard the alarm even if she were asleep. But the issue of whether or not she had sleeping pills and so forth is not developed in the record. That may be an argument for the attorneys in the case. Well, but you have the burden to have something. You can't fight something with nothing. Well, we do have something. We have her testimony that she could hear the children next door and that she didn't hear the alarm that should have gone off or the court found went off. What besides her affidavit? Well, we have the testimony of Mr. Singleton. He was there Christmas of 2011, and so he testified that there was a smoke came from cooking and the alarm didn't go off. That's a fact that we think is uncontradicted. There's nothing in the record to challenge that. Then we think Mr. Tate, our expert, he testified in his affidavit that it's likely that it did not go off under these circumstances. Then we also have what we think is the fundamental error of the court to... is that essentially it's almost circular, which is that nobody woke up or nobody appeared to escape, so therefore the smoke alarm must not have gone off. Am I reading that wrong? I mean, that's basic. There's not a lot more to it than that. Well, he did come and examine the device, and he did come and do some forensic work in that regard, so I would not think that it's limited just to a circular reasoning because they didn't wake up. Therefore, it didn't go off. I think it was more than that, but I can't cite to the record the pages, but I would respectfully say that Mr. Tate did opine and reflect it in the record more than what your question suggests. Okay. But I can't go to the appendix, but I think it's in the record, and I don't want to try to misconstrue the record, Your Honor, but that's my understanding. Let's go by defendants. How is the alarm question relevant to one or more of the defendants? Well, all of them have filed. Let's talk about the city now. Why would this? If you're right about this issue, which defendants were improperly granted summary judgment? Well, I think the housing authority, I think the manufacturer, and I think to some extent the city and the firemen. Well, the firefighters, they arrived later. Well, I understand that. I don't know if they argued that. I don't even know why you joined those, but leaving that aside, the housing authority, the ruling was there's no showing that any breach of duty proximately caused. Now, we know that the mother was awake and fighting the fire, and at least one of the children was with her. So how does whether the alarm could be heard by Ms. Gray from outside the unit affect that proximate cause ruling? Well, I think that you're talking about the duty, and so we— No, I'm not talking about the duty. The court assumed the duty. Okay, well then— I've read the opinion, you know. Well, I understand. And the first thing you said was the duty, but I don't want to go to that. I'm talking about the proximate cause, and that is if it— testimony in the record is clear that if the alarm had sounded, then they would have been given warning, and that would have given sufficient time. But they were—the adult was warned. Well, we just found the adult— She was there fighting the fire. We had found her in the bathroom. That's where she was located. With burns. With burns on her. Serious burns. Yes, but that doesn't— So she had clearly been fighting the fire. Well, that's a conclusion that we think that can come to the jury, but, Judge, this is summary judgment. No, no, wait a minute. Come on. I'm talking summary judgment. Where does the failure to—the alarm sounding affect the proximate cause vis-à-vis the authority? And then as to the alarm manufacturer, I don't understand what defect you're alleging and what evidence you have to prove it. If the alarm didn't sound, that doesn't establish a— are you saying a design defect or are you saying a manufacturing defect? Well, I think it's a—we think the manufacturing defect and design. What's your evidence of manufacturing defect? You probably need an expert for that. Well, I think we had Dr. Russell as an expert that's qualified, and Mr. Tate— That would be—he was talking about design, not manufacturing. Well, I think the fact that it didn't sound and all the other evidence we have indicates that a proper sound alarm would have—I mean, a proper alarm would have sounded, and it didn't in this case, and I'm not suggesting that that's sufficient alone, but I think all the evidence we have indicates— So you agree with me that I couldn't find anything in the briefs that told me whether you allege design or manufacturing, and apparently you didn't— Both. In the complaint? Well, I think we did— And your evidence of design is Russell versus— Goddick. Goddick. Yes, I think that's— What's your evidence of manufacturing defect? Well, we examined the device itself, and so they found that this was not an appropriate device. That's a design, and I understand that. All right. Well, I want to know manufacturing, because its case law distinguishes between the two and how you prove them. Well, I think the fact that it didn't sound, and all the evidence we have that it should have sounded would show that there's some problem with the device itself. Isn't that like a res ipsa loquitur type of argument, that it didn't sound, so therefore there must be a defect or a manufacturing problem? Well, I don't suggest that res ipsa is going to be applicable here because I don't think that doctrine is, but I think that all the record as a whole would justify the conclusion that it did not sound, and it did not timely sound. That's another issue that we have in the appeal that we'll talk about in just a moment, but I hope I've responded to your inquiry. You did. And so we have the testimony, and we have the challenge, the testimony of the defense expert, Mr. Goddick, and I won't go back through that, but we have unqualified—I mean, correct. We have qualified experts that have testified, given testimony in their affidavits, and we think the contrary evidence on the issue of the experts would be sufficient to establish a fact question in this case. That's another element that I suggest is why we have a fact question that supports our position. The manufacturer cited two cases, and we think those, and we've explained those, the Garcia case out of Texas is one where they excluded the plaintiff's experts, and then the Pitway case, the court held that the alarm did sound. And as to the city defendants and the firefighters, we think that— and I know the court said, I don't know why we had it in the case, so I— Well, that means they arrived when it was too late. Well, I understand, but that was—we don't know that it was too late. The person that did the autopsy couldn't determine the time of death. What's the evidence, positive evidence, affirmative evidence, that any of the five were alive when the firefighters arrived? Well, I don't have any evidence as to when the death occurred, but we know it was between the time that Mr. Singleton was on the phone with her, about 2.30, until they came and went in the apartment, which was around 6 after the firefighters came and went into the apartment. Who even speculated they were still alive at 6 or 7 a.m.? I don't suggest anybody speculated, Judge. And so I just understand that they had certain duties, and so I'll talk about that in just a moment, but— Counsel, you know, I don't mean to minimize, this was a tragic, tragic circumstance, but I want to understand your claim against the firefighters. My understanding in terms of your evidence, your positive evidence of what happened here is that the firefighters, you know, were too leisurely in their duties, that basically they were smiling, they were laughing, they were talking to one another, and that therefore they must not have been doing their job. Is that the basic theory behind the claim? Well, plus they came and didn't do a thorough enough search, and that's the result maybe because of what you described as their attitude there, described by Mrs. Jennifer Gray. She is the one that interacted with them, and it is primarily the evidence we have as to the city in the record. But it's beyond just being—for example, she said they played with a toy on the floor. It's beyond that. It's what they didn't do in terms of searching. We know now the fire was next door. They didn't discover it. We should have and could have under these circumstances. We believe those are the facts in the case. So your evidence really, I mean, aside from the fact that they were joking and doing other things along the way, your evidence really is they didn't find the fire, so therefore they must not have done a thorough search. Again, kind of a race ipsa type of thing. I mean, I'm trying to understand this. Well, I don't want to establish—I don't want the race ipsa argument because I don't think it's applicable. But I think the totality of the facts would suggest, and I can't be more specific than that, Judge, but I think— Okay. I cite Mrs. Gray's affidavit and her testimony. Counsel, don't you at least need a factual dispute as to whether any of the family members were still living at the time the firefighters arrived? I don't think we'd have to have a fact question as to whether or not you were alive when the firefighters arrived. Why not? How can a jury find the firefighters caused the death? Well, the issue we have is whether or not there's any evidence, Judge. It's not whether or not I'm going to convince the jury or the district judge was not convinced. But you just said you didn't need evidence. Well, I don't say we don't need evidence, Judge. I do think we have evidence that would justify it. Okay, so what was it? All you told me is that they might have lived. They might have been alive. Well, I concede that we don't have—the coroner could not establish the time of death. And we don't have anybody other than Jennifer Gray, who was there close in proximity. She didn't testify that they were alive. And so I don't think I can say to Your Honor, here's the evidence that we point to that they were alive at the time the firefighters arrived. And so I'll tell you in all honesty that that's the situation. I'm not going to invent anything here today, and I don't think the record would justify me telling you otherwise. Counsel, could you address the issue of whether paragraphs 67 and 68 of the amended complaint sufficiently pled the issue of whether the alarm may have gone off too late or not sufficiently? The court held that that was not adequately pled. Well, we go back and just rely upon our brief. It's a notice of pleadings. And in federal court, the one rule that I've had is that there's no—unless they show prejudice, that would not be a point that should be relied upon. And they responded to it and fully briefed it and argued it. So I rely upon my brief in terms of the adequacy of that argument and that the pleadings were adequate in this situation. No prejudice. Nobody had an impairment of their ability to respond, as you tell from the record. Well, did the defendants in pleading, did they raise this issue to the district court? Well, I'd have to go back and look at the pleadings, Judge. I'll be honest with you. I haven't read every— You probably remember the brief that were written. Did you respond? They did. They did because we responded to it. They did raise it in the brief, I believe. But that doesn't mean that— How did you argue it to the district court? If you look in the record, you'll see that there was no— they had the opportunity to respond to that with their expert and then all of the other issues that we have. I have five minutes left, so let me just make a couple of points that my co-counsel would have made had we divided the time. Ms. Campbell wanted to talk about the standards of review where the court makes no credibility determinations. We think all due respect, the court did that. We had emphasized the Jennifer Gray testimony. Sean Charles was also emphasizing Jennifer Gray, and the smoke detector was not functioning as according to Mr. Singleton's testimony. I've got four minutes and change left. Thank you. Thank you. Mr. Helder, is that right? Excuse me? You're Mr. Helder? Yes, Your Honor. May it please the court, I represent BRK Brands, Inc. That's the smoke alarm manufacturer. For most of the argument, I'm going to rely on the briefs. I'm obviously here to address any questions that you may have, but we are here to respectfully request that you affirm the district court's ruling as the plaintiff and appellant has no and will never have sufficient evidence to prove defect or causation. To answer your question in terms of whether 67 and 68 were sufficiently pled, what the appellants are asking you to do is to provide a torturous reading of the complaint to construe adequate and audible to mean timely or untimely.  It does. But if you look at paragraph 36, it says clearly, the allegation is the alarm did not sound. Not did not timely sound or sounded late. It says in 36 it did not sound. And then there are counts against us in paragraph 131. They say that we had a duty to provide an alarm that would sound, and then in 133 it says we breached that duty because we provided an alarm that would not sound in the presence of smoke. I hope that answers your question. In terms of what we know, what we know from the undisputed facts in the complaint is that at 2 or 2.30, the decedents were all on a phone call with Marilyn Beaver's fiance, I think it's pronounced Ferlanderi Singleton. Moments after, a fire ignited, and that's their words, a fire ignited in the kitchen due to careless smoking. Ms. Beaver's... Smoking or cooking? I'm sorry. You're right. Careless cooking. Ms. Beaver's noticed the fire and fought the fire. The coroner could not identify a time of death. That's what we know. What we don't know is even more profound. We don't know where Ms. Beaver's was when she learned of the fire. Was she in the kitchen when it ignited? Was she in her bedroom when it ignited? When did she learn of the fire? How did she learn of the fire? What was the progression of the fire when she learned of it? What did she do upon learning of the fire? Did she immediately fight it or did she take some time to fight it? How long did she fight it? How much time would she have had to exit if she tried to exit rather than extinguish the fire? There's a case that we... Counsel, there's evidence that throws lots of justifiable inferences on more than half of the issues you just cited, for summary judgment purposes. I would respectfully disagree, Your Honor. The... Well, my point is we don't have conclusive evidence of all these different issues. Well, then go have a trial. Well, Your Honor, as the district court found, in order to find for the plaintiff, the jury must do more than speculate. There must be substantial evidence beyond a mere probability, and I don't think any of the evidence gets past that mere probability. It's similar to the Warner case. I'll bet you we could spend a half hour in the library and find a ton of fire cases where reconstructionists could only go so far, and what was left was drawing inferences and probabilities out of what obviously did happen. Your Honor, I think that you would start with the case of Warner, which is the Western District of Wisconsin case that we cited in our brief, which is almost a similar case than what we have here. It was a case against a smoke alarm manufacturer. Your Honor, I don't want to go through cases. I just don't understand why you dwell on that point when the district court had far more concrete analysis that I would have assumed you would defend. I defend everything the district court found, starting with defect and then going to proximate cause. Well, then I don't understand your priorities this morning. Let's... The priorities are to address the court's concern, if there is any, as to whether there is any evidence of which you can build to create a case that a jury would do anything other than speculate, and I suggest there isn't any. What we know addresses the fact that she had time to escape, but she chose to, whether it was a choice that most people would make or not, she chose to try to extinguish the fire. Okay, now you're answering some of the questions you said were unanswerable. Right. So, you know, she chose... A smoke alarm is there to provide notice of a smoke event or a fire event. It can't make you leave. It can't make you make good or bad decisions. She had notice. She learned of the fire, and she attempted to extinguish it. But the notice could have come too late. Suppose that their theory is right and that the smoke alarm was delayed, and had it sounded earlier, she could have fought what would have been a small fire that eventually became a huge fire and was unfightable. The only evidence that the smoke alarm could have sounded late, forgetting the pleading issue, is Dr. Russell. Dr. Russell, similar to how he was excluded in the Johnson case, didn't address the facts. He avoids the facts. His opinion is that in a smoldering fire, an ionization alarm, of which this was, may sound too late. There's no evidence that this is a smoldering fire. The evidence is, as the plaintiffs allege, that the fire ignited moments after a call. That's not a smoldering fire. For his defect to be relevant, to have probative value here, there has to be evidence of it, and there is none here. Were they able to determine why the fire went out before the firefighters arrived? The determination was that it lacked oxygen after a while, and once the oxygen left, the fire went out. There's no evidence that she successfully extinguished the fire, if that's your question. In terms of Goddick, very quickly, because I have less than a minute, he did an analysis called enhanced sonic deposition, which has been adopted by the NFPA over Dr. Russell's objection. That is a test where you look at the opening of the horn and you look for a pattern of smoke. That has been tested, what I call double blind, where the analysts didn't know which alarms had power versus didn't and which alarms sounded versus didn't, and in those analyses, they were 100%. They looked at post-fire the horns and determined which sounded and which didn't, and that's part of the reason why the NFPA adopted it. If there's no further questions, I think it's time for me to turn my speech over to the other appellants. Thank you, Your Honors. Ms. Young, right? Good morning, Your Honors. My name is Kimberly Young, and along with Will Griffin, I represent the Housing Authority Appellees in this case. My clients were in a position of being the landlord for the apartment at issue where the fire took place. The district court did grant summary judgment in our favor, and we are here asking that that ruling be affirmed. The common thread between the claims made against BRK as the manufacturer and the claims made against my clients as the landlord is that both of those claims were based on an allegation that there was some defect in the alarm and that that's what ultimately caused the appellant's damages. And because of that, the same lack of proof that was dispositive of BRK's summary judgment motion is also dispositive of the housing authorities. Counsel, could you address the issue of which HUD regulations applied to your claim? Yes, Your Honor. I'm going to move this down just a little bit. The lease that was entered into between the Housing Authority and Ms. Beavers had a provision where the Housing Authority did agree to apply with any HUD regulations materially affecting health and safety. The provision of the HUD regulations that the plaintiffs and the Housing Authority agreed applied was the one found in 24 CFR 5.703, and that's the requirement that the Housing Authority has at least one working smoke alarm in the unit. And so when we originally filed our motion for summary judgment, at that point the only theory of liability that the appellants had was that the smoke alarm had failed to sound. We had the expert testimony by Dr. Goddick that the enhanced soot deposition established that it had in fact sounded, and the experts for the appellants were unable to say that it was their opinion that it had failed to sound that night. So based on that evidence, that's why we filed for the summary judgment. Now in response to that motion, the appellants did come forward and asked the court to recognize three additional duties, and the source of those duties came from the 2007 Arkansas Fire Protection Code. And so what the court did is she looked at the first two of those duties, which was to do monthly inspections on the smoke detector and to replace the smoke detector at 10-year intervals, and she made the point that the code that was the source of those duties actually had not come into effect until a year after this lease was signed. So it appears that she did have a question on whether they would actually apply, but for purposes of the motion she did assume that they did apply. The only duty that was raised by the appellants that she rejected was the duty to place an alarm in all of the sleeping rooms, and she did that because the section of the code where that duty arose is in the section that applies to new construction, and that would be 907.2. As I understand the record, there was an inspection of the alarm, but it was not replaced after 10 years. Is that correct? That is correct. The alarm had been inspected and shown to be in working order in December before the fire and also in January before the fire that took place the following March. And so even though, first of all, we do believe the court was correct in holding that that duty did not apply. She pointed out that even the plaintiff's expert, Roger Tate, was equivocal on whether that would apply. I think his phrasing was it is less than clear whether it would apply since this was not new construction. However, the purpose behind, whether it's inspections or replacement of the alarm, is to ensure that they're still in working condition. Any evidence on what the nature of the inspection was? It's one thing to go around and press the test button to see if it sounds. It's another thing to test if it will perform right in a fire. It's my understanding that the two inspections that took place were under the context of a work order. The maintenance people are in there to do something else, some kind of minor maintenance or repair, and it's the practice of the housing authority to push the button. The button not only ensures that it is connected to power, as it should be, but it also recreates the balance or the chemical reaction inside to show that it would actually sound an alarm under the right circumstances, under the smoke. Even though, to get back to your question, even though the court declined to apply that duty to us, we do feel that even if the duty were applied, we would still run into the same issue with causation because both the inspections before and also the expert testimony and opinions that were formed after the fire all indicate that the smoke alarm was working at the time of the fire. Was there any evidence that the burns on Ms. Beavers did not reflect an attempt to fight the fire? No, Your Honor. There is not. Any expert testimony that has addressed the issue found that the placement of the burns and the severity of the burns, the placement being on her hands and her forearms and the back of her neck. Her face or her forehead. Yes, near the neck and the forehead. And the fire was up high. Yes, all of those would be consistent with an attempt to put out this kind of blazing kitchen fire. Was there any evidence that despite being awake and apparently fighting the fire, she did not have an opportunity to wake and safeguard the three children who may have been sleeping through the entire tragedy? I think that a definitive answer to that question falls into the list of questions that the district court found were unknown from the evidence. Well, that means there's no affirmative evidence that she did not have time to protect. If the three children who may not have heard an alarm or may not have been awakened by it, if there was time for the awake parent to get them out of the unit, that's different than otherwise. I think the only circumstantial evidence... In terms of proximate causation. Yes, Your Honor. I think the circumstantial evidence on that issue, and I know I need to wrap up to leave time, but the circumstantial evidence on that issue would be that she did at least have time to make an attempt to put out the fire and to knock the alarm off of the ceiling. And so there have been cases cited in the briefs that indicate the choice of someone in that situation, while obviously put in an impossible situation, if they make those choices when they could have made the choice to escape, to get the children and leave immediately, that that is a factor that should be weighed in favor of the defense. And I will yield the rest of my time to Ms. Adams. Thank you. Good morning, Your Honors. May it please the Court, my name is Jenna Adams, and I'm here representing the City of Jacksonville and the Jacksonville firefighters named in this lawsuit. I'm here today to ask that the Court affirm the District Court's granting summary judgment with respect to the City of Appalachia for the following reasons. First, there's no causal link between the City's actions and the decedent's deaths. Second, even if there is some evidence to establish a causal connection, there's no constitutional right to adequate fire protection. Even assuming that the Arkansas statutes and the Jacksonville City Code provision imposed a state law duty to provide. So you talked about constitutional? We're talking about state law duty of firefighters to protect citizens when they are aware of and have an opportunity, the ability to protect them. Is there no such state law duty? Well, even if there is a state law duty, that doesn't create a constitutional duty under the Due Process Clause. Why does it have to be constitutional in this case? That was what their claims were. Their claims are the 14th Amendment Due Process Clause. This is only a 1983 claim against the firefighters? Yes, Your Honor. No state law claim? They may have brought a negligence claim. I don't think so. It shouldn't surprise me because I know why that would be true, but it's very counterintuitive. Otherwise, unless you understand Section 1988. Fourth, the city's actions did not shock the conscience. Therefore, there was no due process violation. But you agree on that's a substantive due process claim. You do agree that had the actions of the firefighters been different, we could have had a shock the conscience claim. You made the blanket statement there's no constitutional claim, but had the firefighters shown up and laughed while people burned or did something outrageous, then there would be a claim for a substantive due process. Sure, but we don't have that here. I agree. If we go through all the actions of the firefighters, skipping ahead here, they walked through Ms. Gray's apartment. I'm not sure you could find a non-custodial case. Right, exactly. That would support what Judge Strauss just said. There's no case out there. What the appellants are asking us to do is to expand the special exception and say that they weren't in the custody of the city. They're wanting to expand it to say that these Arkansas statutes and the Jacksonville City Code somehow created a special relationship and that it created a duty. We don't have that here, and I don't think the court should do that because there's no case law saying that that would ever be applicable. I hope that answered your question. You did. Okay. To address causation first, we submit that Judge Baker correctly held that there was no causal connection between the city's actions and the decedent's deaths. As I started to say, the city and the firefighters' actions or inactions simply didn't cause their deaths. The fire started moments after a 2 a.m. phone call. A 911 call wasn't made until 5.46 a.m. Four hours later. By the way, why are the council so positive of that, that it started almost immediately after the phone call? That was actually alleged in their complaint, that it started moments after 2 a.m. It is undisputed that the fire was ongoing at the time. The evidence simply points that it wasn't ongoing. There was no smoke or fire that could be seen when they did a walkthrough of Ms. Gray's apartment. They felt high and low on the walls, couldn't feel any heat, and the walls do adjoin with the appellant's apartment. No one answered the door when they knocked twice. They looked through a slit in the window and they saw no signs of fire. They used the thermal imager scan on the interior, in the attic, and also on the exterior of the building, and it indicated no hostilities, no extreme heat. They scanned the attic, they saw no visible signs of fire, and they completed a perimeter search with the thermal imager and they saw no signs of fire. As you were asking earlier, none of these actions shocked the conscience. So we don't have a constitutional violation. There was no causal connection. And as I mentioned earlier, there simply is just no constitutional duty to provide adequate fire protection. The Supreme Court and this court have routinely held that there's no right to adequate fire protection. And both to Shaney, Shortino v. Willer, and Dodd v. Jones, I see that I'm out of time. So unless you guys have any questions, I am done. Thank you. Thank you. Mr. Hodges for rebuttal? Yes, just briefly. To address your question, the HUD regulation we cited in our brief, and I can't quote it to you now, but we adequately, I think, discussed that obligation in the brief. Dr. Pretty, the coroner, on page 1037 of the appendix, gave the estimate the time of death was between 0221 and 0545. That's docket number 188-2. The point is three kids were in the bedroom. That's a fact. And that's all five? Sir? And that's all five victims? I couldn't hear. That's all five victims at that estimated time? That's correct. So there's affirmative evidence they were dead before the firefighters arrived? Well, you'd have to assume that that's correct. Well, I said there is affirmative evidence. Yeah, there's some evidence. I'm not saying it's. There's some evidence, but that's part of the record. But there's nothing to the contrary. Well, there's nothing to the contrary. I agree with that, Judge. I don't have any. The coroner didn't say anything else other than that. We have a record. Well, but I go back to the point you made, Your Honor, was that all of what they're talking about, the inferences and all, can and should be decided by a jury, not the judge on summary judgment. I go back and quote the rule, which is, the district judge should not determine the credibility. We think that was part of what happened. We're determined, are there fact questions, and we believe we've created fact questions on all of them. The rest of the answers, they made an argument that Mrs. Beavers knocked the device off the ceiling. There's no evidence in record, with all due respect, who knocked this off the ceiling and it was on the floor. It was on the floor among all the soot, and then yet their expert relied upon soot as the basic basis for the argument that it was on. I thought it was part of your positive case that there was soot on top of the alarm showing that it fell while the fire was still in process. Well, all we know is that there was soot, it was on the floor, soot was all around it, soot was on top of it, and so yet their expert comes and says, well, soot is the basis on which we say it now sounded, but could it have came from the fire? No, he was talking about soot on the horn itself. Yes, he was talking about soot on the horn. I don't know if it's your reply brief or your main brief, but you argued there's evidence that the alarm was on the floor because it had soot on top of it. Well, we know it was on the floor. There's no doubt about that, but they argued a moment ago that Mrs. Beavers caused it to be knocked off the ceiling and on the floor, and I'm pointing out. They didn't argue. They said that was among the hypotheses. Well, I heard the words Mrs. Beavers knocked it off, and so that's the reason I wanted to point that out. I don't think there's anything to support that. And also there's undisputed in this record. But that would support that she also had time to go in and wake the sleeping kids. Well, that's an inference for the jury, with all due respect. That could be decided at the jury trial. But, Judge, there's no other dispute that this is a nine-year-old, two-old alarm in the record. No one disputes that. It had a ten-year life expectancy, yet it had nine years too old. And then also I think that's all the points I'm making. I've got one minute left. I'll yield them back unless you have a question. Thank you. When you said life expectancy, you mean the lease required replacement? Yes. Well, not only that, but the manufacturer recommended that they do it. So that's the housing authority. When they come in and see that it's nine years too old, then that's part of what we think the duty was under the agreements and so forth. That's part of the fact question as to the housing authority. I'm not asserting that against the manufacturer. Thank you. Thank you, Counsel. The case has been thoroughly briefed and argued, and we will take it under advisement.